**TRANSPORTATION INSTITUTE, et al., Plaintiffs,**

**Joint Maritime Congress, et al., Plaintiffs-Intervenors,**

**v.**

**Elizabeth H. DOLE, et al., Defendants.**

Civ. A. No. 83–3048.

United States District Court, District of Columbia.

Feb. 21, 1985.

John W. Angus III, Kathryn Broderick, Jonathan Blank, Washington, D.C., for Transp. Institute.

Richard Kirschner, Washington, D.C., James M. Altman, New York City, for Seafarers Intern.

Joan Z. McAvoy, Larry M. Lavinsky, Washington, D.C., for plaintiffs-intervenors.

Robert G. Damus, Linda L. Cromwell, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on defendants' motion to dismiss or for summary judgment, plaintiffs' and plaintiff-intervenors' oppositions thereto, defendants' reply to plaintiffs' and plaintiff-intervenors'

oppositions; plaintiffs' and plaintiff-intervenors' motions for summary judgment, defendants' opposition thereto, plaintiffs' and plaintiff-intervenors' replies to defendants' opposition, oral argument on the motions, and the entire record herein. For the reasons outlined below, the Court grants plaintiffs' and plaintiff-intervenors' motions, and denies defendants' motion to dismiss or for summary judgment.

## FINDINGS OF FACT

Plaintiffs and plaintiff-intervenors come to this Court seeking relief against certain governmental agency heads and to have the Court declare the Cargo Preference Act (or the "Act"), as amended, 46 U.S.C. § 1241(b), applicable to the Blended Credit Program (or the "Program") as administered by the United States Department of Agriculture.

They further seek to have this Court declare that the defendants' failure or refusal to enforce the Cargo Preference Act to the Blended Credit Program is unlawful and beyond the scope of their legal authority and, therefore, is arbitrary, capricious, and an abuse of discretion.

The plaintiffs and plaintiff-intervenors also request this Court to permanently enjoin defendants from refusing to comply with and enforce the terms of the Cargo Preference Act.

*The Parties*

Plaintiff Transportation Institute ("TI"), and plaintiff-intervenor Joint Maritime Congress ("JMC"), are private, non-profit entities dedicated to research and education on maritime issues and to activities promoting the United States-flag ("U.S.-flag") fleet. Motion for Summary Judgment in Favor of Plaintiff Transportation Institute ("TI's *Motion for Summary Judgment*"), Affidavit of Peter J. Luciano at ¶ 2 ("Luciano Affidavit"); Plaintiff-Intervenors' Motion for Summary Judgment, Affidavit of David Leff at ¶ 2 ("Leff Affidavit").

TI and JMC members operate U.S.-flag vessels engaged in the U.S. foreign and domestic shipping trades. Luciano Affida-

vit at ¶ 2; Leff Affidavit at ¶ 2. TI and JMC members have carried, currently carry, and are available in the future to carry cargoes shipped on U.S.-flag vessels pursuant to United States Government export programs subject to the Cargo Preference Act. Luciano Affidavit at ¶ 2; Leff Affidavit at ¶ 2. Many TI and JMC members have carried preference cargoes of agricultural commodities on the same shipping routes on which commodities have been shipped under the Blended Credit Program administered by the United States Department of Agriculture. Luciano Affidavit at ¶ 2; Leff Affidavit at ¶ 2.

Plaintiffs Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO ("SIU") and the Marine Engineers Beneficial Association, AFL–CIO ("MEBA") are national labor unions who represent, for collective bargaining purposes, unlicensed seamen, and licensed engineers, respectively, who work on U.S.-flag vessels engaged in the U.S. foreign shipping trades. Plaintiff Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO Motion for Summary Judgment ("SIU *Motion for Summary Judgment*"), Affidavit of Angus Campbell ¶ 3 ("Campbell Affidavit"); Plaintiff-Intervenors' Motion for Summary Judgment; Affidavit of Mario C. White at ¶ 2 ("White Affidavit"). Many of these seamen and engineers have worked, currently work, and are available in the future for work on U.S.-flag vessels that carry preference cargoes, including cargoes of agricultural commodities. Campbell Affidavit at ¶ 8; White Affidavit at ¶ 3. Some of those vessels have carried agricultural cargoes on the same shipping routes on which such commodities have been shipped under the Blended Credit Program. Campbell Affidavit at ¶ 8; Leff Affidavit at ¶ 2.

Plaintiff-intervenors Aeron Marine Shipping Company ("Aeron"), Aquarius Marine Company ("Aquarius"), Marine Bulkcarriers, Inc. ("Marine"), and Transbulk Carriers, Inc. ("Transbulk") either own or have under bareboat charter U.S.-flag vessels

eligible to carry and capable of carrying agricultural preference cargoes. Plaintiff-Intervenors' Motion for Summary Judgment; Affidavit of Phillip J. Shapiro at ¶¶ 2, 4; Affidavit of Michael Berkowitz at ¶ 2; Affidavit of Samuel Rosenbloom at ¶ 2.

Defendant Elizabeth H. Dole is Secretary of the United States Department of Transportation ("DOT"), having been duly appointed to that position by the President. Defendant H.E. Shear is Administrator of the Maritime Administration ("MARAD"), having been duly appointed to that position by the President. Pursuant to Title 46, Section 1603 of the United States Code, the Maritime Administrator "shall report directly to the Secretary of Transportation and shall perform such duties as the Secretary of Transportation shall prescribe." Defendant John R. Block is Secretary of the United States Department of Agriculture ("USDA"), having been duly appointed by the President. These officials are being sued in their official capacity as officials of the United States Government.

*Agricultural Program at Issue*

The Commodity Credit Corporation ("CCC") is a corporation organized and existing under the laws of the United States. The CCC is a federal agency, within the USDA, and established by Congress pursuant to the Commodity Credit Corporation Charter Act. 15 U.S.C. §§ 714 *et seq.* It was created "[f]or the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities ..., and of facilitating the orderly distribution of agricultural commodities...." *Id.* The CCC is "subject to the general supervision and direction of the Secretary of Agriculture." *Id.*

Pursuant to 15 U.S.C. § 714c, the CCC administers certain programs in which it undertakes to finance export sales of agricultural commodities and to make certain guarantees in connection with export sales of agricultural commodities. *Id.*

Two programs that are at issue in this action, the CCC Export Sales Program ("GSM–5") and the CCC Export Credit Guarantee Program ("GSM–102"), are administered by the CCC.

Under the GSM–5 program, the CCC will enter into a financing agreement with a United States exporter of agricultural commodities by which the CCC purchases for cash, after delivery, the exporters account receivable arising from the export sale. 7 C.F.R. § 1488.1(b) (1983). Under this program, the CCC will allow the foreign importer up to three years to repay the account receivable at a specified rate of interest. *See* 7 C.F.R. §§ 1488.1(a), 1488.14. The account receivable purchased by the CCC must be backed by a letter of credit in a form acceptable to the CCC and which is issued in favor of the CCC by a United States or foreign bank. 7 C.F.R. § 1488.-12. Under the terms of GSM–5, an exporter is virtually protected against all risks of nonpayment except for nonpayments resulting from his breach of contract, certification, or warranty, or nonpayment of any amounts not covered by the bank obligation owing to the CCC.

The USDA has stated that:

The program is designed to stimulate the export of U.S. commodities in adequate supply to make possible commercial sales which might not be made by the U.S. in the absence of program financing. The program is particularly helpful in opening new markets, preserving or increasing the U.S. share of existing markets, preventing the decline in the U.S. share or loss of a U.S. market; and in assisting developing countries with commercial potential in their transition from purchases under concessional and aid-type programs to commercial purchases. The program eases the transition for the country from long-term concessional buying to eventual cash purchases.

Exhibits in Support of Motions of Plaintiffs and Plaintiff-Intervenors for Summary Judgment ("Plaintiffs' Exhibits"), Exhibit 18 at 2.

The GSM–5 regulations provide that the provisions of the Cargo Preference Act are not applicable to shipments under this program. 7 C.F.R. § 1488.1(c).

Under the GSM–102 program, a United States exporter obtains from the foreign importer a guarantee of payment of the selling price of the agricultural commodities, in the form of a bank letter of credit. 7 C.F.R. § 1493.1. The CCC guarantees the United States exporter or the exporter's assignee against losses resulting from any failure of the foreign bank or its correspondent bank to honor drafts drawn upon it or otherwise to remit amounts properly due the exporter or his assignee. 7 C.F.R. §§ 1493.4, 1493.9, 1493.10. The CCC will guarantee payments under this program for a period of up to three years. 7 C.F.R. §§ 1493.1(a), 1493.2(1), 1493.4, 1493.9, 1493.10.

The stated purpose of the GSM–102 program is to "transfer[ ] the risk of loss due to defaults in payment by foreign banks from the exporters and their financing institutions to CCC...." 7 C.F.R. § 1493.1. The program is also "intended to: facilitate exportation; forestall or limit declines in exports; permit exporters to meet competition from other countries; and increase commercial exports of U.S. agricultural commodities." *Id.*

The GSM regulations provide that the provisions of the Cargo Preference Act are not applicable to shipments under this program. 5 C.F.R. § 1493.1(c).

On October 20, 1982, Secretary of Agriculture John Block announced the creation of a three-year, $1.5 billion Blended Credit Program to be administered by the CCC. *See* Plaintiffs' Exhibit 1. The Blended Credit Program combines interest-free government credit under the GSM–5 program with government-guaranteed private credit under the GSM–102 program.

The Program utilizes funds in accordance with Section 135 of the Omnibus Budget Reconciliation Act of 1982 (Pub.L. No. 97–253), 96 Stat. 763, 772 (1982). In that section the Secretary of Agriculture is required to expend funds for export credit financing under existing programs of the CCC.

The Blended Credit Program as formulated for fiscal year 1983 utilized 80 percent GSM–102 guarantees and 20 percent GSM–5 credits to provide an interest rate approximately 2 percent below prevailing U.S. market values. For fiscal year 1984 the blend was altered and varied slightly by country, with the average blend approximately 85 percent GSM–102 and 15 percent GSM–5.

As stated by USDA, the purpose of the Program is to expand U.S. agricultural exports to help relieve price pressures caused by surplus supplies. Plaintiffs' Exhibit 1. The Blended Credit Program was intended to provide new export credits principally to developing countries.

From the announcement of the Program through January 5, 1984, blended credit sales were made to the following fifteen countries: Bangladesh, Brazil, Chile, Egypt, Iraq, Jamaica, Korea, Morocco, Pakistan, the Philippines, Portugal, Thailand, Tunisia, Yemen, and Yugoslavia. TI's Motion for Summary Judgment, Affidavit of Kathryn P. Broderick at ¶ 5.

Foreign governments were invited by the Secretary of Agriculture to apply for financing under this Program by submitting proposals directly to the USDA or by directing such proposals to USDA through the United States embassies overseas and the foreign embassies located in Washington, D.C. *See* Plaintiffs' Exhibit 22. Officials from USDA have traveled to foreign countries to encourage and assist foreign governments to apply for the Program.

In deciding whether to approve countries for blended credits, USDA expressly considered the economic needs of the prospective importing country. *See* Plaintiffs' Exhibit 25.

Without the Blended Credit Program in effect, the sales that occurred through the Program would not have been possible. *See* Plaintiffs' Exhibit 24.

*The Cargo Preference Act*

Plaintiffs and plaintiff-intervenors contend that, when implementing the Blended Credit Program, USDA must apply the Cargo Preference Act. The Cargo Preference Act provides, in pertinent part:

(1) Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials, or commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such equipment, materials, or commodities (computed separately for dry bulk carriers, dry cargo liners, and tankers), which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas....

(2) Every department or agency having responsibility under this subsection shall administer its programs with respect to this subsection under regulations issued by the Secretary of Transportation.

46 U.S.C. § 1241(b) (1983).

Up through July 27, 1983, DOT and MARAD took the position that the Cargo Preference Act applied to the Blended Credit Program. This position was stated in at least twelve separate documents ranging in time from January 13, 1983, through July 27, 1983. *See* Plaintiffs' Exhibits 2–13.

Since the announcement of the Blended Credit Program on October 20, 1982, Secretary Block and the CCC have taken the position that the Cargo Preference Act does not apply.

On July 27, 1983, Maritime Administrator Shear reversed MARAD's prior position and declared that "DOT will not seek to apply cargo preference requirements to [U.S.D.A.'s] Blended Credit Program as presently formulated." Plaintiffs' Exhibit 8 at 1. In coming to this conclusion, defendant Shear stated that:

[I]n our view [the cargo preference] laws apply to export credit programs such as those administered by [USDA's] Commodity Credit Corporation. Nevertheless, it is apparent that the application of U.S. flag carriage requirements to the present blended credit program would result in costs that would entirely offset the program's benefits, thereby defeating the underlying purpose of both the blended credit program and the cargo preference laws.

*Id.*

### CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to sections 1331, 1337, and 1361 of Title 28, United States Code. Declaratory relief is authorized by sections 2201 and 2202 of Title 28, United States Code. Venue is also proper pursuant to section 1391(e) of Title 28, United States Code.

Because there are no genuine issues of material fact and the only issues to be resolved are those of questions of law, summary judgment is appropriate in this action. *See* Fed.R.Civ.P. 56(c).

*Article III Standing Considerations*

Defendants assert that plaintiffs and plaintiff-intervenors do not have sufficient Article III standing to contest defendants' allegedly illegal activity. The Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), recently set forth the standard by which a court determines whether a plaintiff has constitu-

**894**

tional standing to bring an action. The test provided:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ..., and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision...."

*Id.* at 472, 102 S.Ct. at 758 (citations omitted). This standard may be simply described as the "injury-in-fact" test.

In addressing the first prong of the constitutional standing criteria as outlined in *Valley Forge,* the Court notes that both the plaintiffs and plaintiff-intervenors have sustained real economic injury. The failure of defendants to enforce the Cargo Preference Act to the Blended Credit Program has caused TI members to miss the opportunity to carry such cargoes; has prevented SIU members from working aboard vessels that might carry such cargoes; has prevented the JMC from collecting contributions that would have been received had its members carried such cargo; has caused the MEBA to lose dues it would have collected from its members who, instead of being idle, would have had the opportunity to work on ships that carried such cargoes; and has prevented Aeron, Aquarius, Marine and Transbulk from attaining employment possibilities for their ships had they had the opportunity to carry such cargoes.

Plaintiffs and plaintiff-intervenors claim injury based on lost income and lost employment opportunity because of defendants' failure to apply the Cargo Preference Act to the Blended Credit Program. If, for example, 50 percent of the cargo shipped under the Blended Credit Program were reserved for U.S.-flag vessels as directed by the Act, plaintiffs and intervenor-plaintiffs contend that they would have benefited from that increased use of U.S.-flag ships.

■ These claims do satisfy the actual or threatened injury requirement as out-

lined in *Valley Forge.* The loss of business, employment opportunities, and money is more than the "identifiable trifle" that plaintiffs and plaintiff-intervenors need, to meet the "actual or threatened injury" prong of the constitutional standing requirement. *Cf. Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir.1984), citing *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 714 (D.C.Cir.1977); *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973).

■ In addressing the second prong of the "injury-in-fact" test, as outlined in the *Valley Forge* case, the Court must determine whether the injury alleged by plaintiffs and plaintiff-intervenors can be fairly traced to the allegedly illegal activity of defendants. Certainly, there can be no argument that the alleged loss of business, employment opportunity, and money is fairly traceable to defendants' failure to enforce the Cargo Preference Act. Had the Act been enforced to the Blended Credit Program, plaintiffs and plaintiff-intervenors would have enjoyed some benefit from the Program. No showing, other than the injuries claimed "fairly can be traced" to the unlawful acts, is required to satisfy the second prong of the "injury-in-fact" test. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. at 472, 102 S.Ct. at 758. Accordingly, plaintiffs and plaintiff-intervenors have satisfied the second prong of the constitutional standing requirement as outlined in *Valley Forge.*

The final prong of the "injury-in-fact" test is whether the plaintiffs' claims can be redressed properly and remedied by a decision from this Court in their favor. In satisfying this requirement, it is plain that a plaintiff "need not negate every conceivable impediment to effective relief no matter how speculative...." *International Ladies Garment Union v. Donovan,* 722 F.2d 795, 811 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438

U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

Defendants argue that even if plaintiffs and plaintiff-intervenors were granted the relief requested, there is no guarantee that foreign buyers would continue to use the Blended Credit Program. They state that by adding the cost of U.S.-flag shipments the benefits attained through this Program would be lost completely.

To accept defendants' argument would require this Court to conclude that the Blended Credit Program cannot be modified so as to maintain the benefits of the Program while at the same time implementing the terms of the Act. Defendants have not provided this Court with any basis for making that assumption. *See infra* at 906–907.

Further, as Judge Wilkey stated in *Community Nutrition Institute v. Block,* 698 F.2d 1239 (D.C.Cir.1983), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), "because the relevant inquiry is directed to the effect of a future act (the court's grant of the requested relief) it would be unreasonable to require the plaintiff to *prove* that granting the requested relief is *certain* to alleviate his injury." *Id.* at 1248 (emphasis in original). In fact, he warned that "a court should be careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal governmental action." *Id.* Judge Wilkey stressed that the redressability element "does not prevent a court from hearing a case which may ultimately be unsuccessful." *Id.* at 1249; *see also Bryant v. Yellen,* 447 U.S. 352, 367, 100 S.Ct. 2232, 2240, 65 L.Ed.2d 184 (1980) (farmers seeking to enforce a statute which if applied would make lands available for purchase have standing even though they could not establish with certainty that they would be able to make such purchases.)

Defendants also argue that the standing issues addressed in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), are similar to the present case. In *Eastern Kentucky Welfare Rights,* petitioners were an organization and individuals representing indigents who were denied needed hospital services. These petitioners challenged a Revenue Ruling allowing favorable tax treatment to hospitals despite their refusal to treat indigents without charge. The Court determined that the petitioners were without standing to pursue this action because it was speculative whether the injuries complained of, that is, indigents not receiving free medical care, could be cured by a trial court's granting the relief petitioners requested. If the petitioners were granted the relief of establishing a requirement that all hospitals serve indigents as a condition to favorable tax treatment, the Court concluded that it would not necessarily follow that these hospitals would, in fact, treat indigents. Many hospitals might forego the favorable tax treatment rather than take on the burden of caring for indigents. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 42–43, 96 S.Ct. at 1926–1927.

In *Warth,* the individual petitioners, who were minority persons with low or moderate incomes, challenged a township's zoning ordinance which they claimed excluded individuals of similar means from living in the town. The Court denied these individual petitioners standing, reasoning that there was nothing in the record which would indicate that builders would build projects within the township at prices petitioners could afford. *Warth v. Seldin,* 422 U.S. at 506–07, 95 S.Ct. at 2209–10.

In the present case, however, unlike *Simon* and *Warth,* the loss of business and employment opportunities can be traced directly to defendants' actions. Further, it is probable that if this Court were to grant the relief requested, some benefits would arise for plaintiffs and plaintiff-intervenors in that they may receive some preference cargoes from USDA export programs.

■ For the reasons stated above, the Court finds that plaintiffs and plaintiff-intervenors have alleged "injury in fact" and, therefore, have satisfied the Article III standing requirements.

*Prudential Considerations of Standing*

■ This Court must also determine whether plaintiffs and plaintiff-intervenors have met the prudential concerns of standing in that the claims asserted by them are within the "zone of interest." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). "In this Circuit, the zone of interest test requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which the suit is brought." *Autolog Corp. v. Regan*, 731 F.2d at 29, *citing Copper & Brass Fabrications Council v. Department of the Treasury*, 679 F.2d 951, 952 (D.C.Cir.1982). In examining the Cargo Preference Act, there can be no dispute that it was designed to protect U.S.-flag vessels from competition from low-cost foreign flag vessels. *See* 46 U.S.C. § 1101. Therefore, plaintiffs and plaintiff-intervenors are well within the "zone of interest" and, accordingly, satisfy this Court's prudential concerns of standing.

*The Cargo Preference Act and its Legislative History*

Before resolving the issues presented in this action, the Court must first review the terms of the Cargo Preference Act and its legislative history in order to address adequately these issues.

In interpreting the meaning of a statute, a court's "starting point must be the language employed by Congress." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979); *see also Wilson v. Turnage*, 750 F.2d 1086, 1090 (D.C.Cir.1984). The legislative purpose of Congress "is expressed by the ordinary meaning of the words used. Thus absent a clearly expressed legislative intention to

the contrary, that language must ordinarily be regarded as conclusive." *Wilson v. Turnage*, at 1090–1091 (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)) (citations omitted).

For the sake of clarity, the Court repeats the relevant portion of the Cargo Preference Act.

Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any ... commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such ... commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such ... commodities ... which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas....

46 U.S.C. § 1241(b)(1).

■ By its express terms, the Act is quite broad in scope. It is not limited, as defendants so contend, merely to foreign aid programs, concessional transactions, or government procurement.

The purpose of the Cargo Preference Act is to "implement the policy established in the Merchant Marine Act, 1936, that the United States should have a merchant marine sufficient to carry a substantial portion of its waterborne export and import foreign commerce." H.R.Rep. No. 2329, 83d Cong., 2d Sess. at 1 (1954) ("House Report"), U.S.Code Cong.Admin. 1954, p. 3173. Because of the higher shipping costs associated with American shipping, competition with foreign low-cost ships otherwise

would be difficult without the establishment of cargo preferences.

A review of the complete legislative history of the Cargo Preference Act demonstrates that it was passed by Congress with the expressed desire that it apply to "programs financed in any way by Federal Funds." S.Rep. No. 1584, 83d Cong., 2d Sess. at 5 (1954) ("Senate Report").

On March 31, 1954, Senator John Marshall Butler of Maryland introduced on the Senate floor a cargo preference bill, S. 3233. The bill's purpose was stated in its title: "[T]o provide permanent legislation for the transportation of a substantial portion of waterborne cargoes in United States-flag vessels...." 100 Cong.Rec. 4158 (1954). In his introductory remarks, Senator Butler as the bill's sponsor, addressed both the need for the "50/50" cargo preference for American "give-away foreign-aid cargo," *id.*, and for surplus agricultural commodities to foreign nations. *Id.* at 4159. The Senator stated with reference to the latter:

> [There are for the Congress's] consideration a number of bills providing in one way or another for the sale of surplus agricultural commodities to foreign nations. There is a great deal of merit in the type of legislation, for the need for disposal of these surpluses is acute. However, at the same time we must not lose sight of the fact that we have a merchant marine whose welfare is a recognized matter of national self-interest.
>
> \*   \*   \*   \*   \*   \*
>
> I am submitting ... for your consideration an amendment to the Merchant Marine Act of 1936 which will provide general legislation to *insure the transportation of a substantial portion of our waterborne cargoes in United States vessels.*

*Id.* (emphasis added).

Examining the hearings on S. 3233 held in the Senate, it is plain that the bill proposing cargo preferences would not be limited to foreign aid cargoes but would include surplus commodities procurred through the presence of governmental guarantees and advances of funds or credits.

On May 5, 1954, in his opening remarks to Subcommittee No. 4 on Water Transportation of the Committee on Interstate and Foreign Commerce ("the Subcommittee"), Senator Butler stated that:

> Senate bill 3233 ... would broaden and make permanent and all-inclusive the cargo preference ... provisions now on the statute books with regard to various Federal aid, loan and military programs.
>
> \*   \*   \*   \*   \*   \*
>
> *With foreign aid programs declining, it would seem all the more necessary that a larger proportion of federally financed cargoes be transported in American bottoms.*

Hearings on S. 3233 before Subcommittee No. 4 on Water Transportation of the Senate Committee on Interstate and Foreign Commerce, 83d Cong., 2d Sess. at 1–2 (1954) ("Senate Hearings") (emphasis added).

The first witness called at the hearing on May 4, 1954, was Thorsten V. Kalijarvi, Deputy Assistant Secretary for Economic Affairs, Department of State. Mr. Kalijarvi came to the hearing to express the State Department's opposition to the nonforeign aid aspects of S. 3233, specifically "cargoes owned or financed by various government agencies." *Id.* at 10. Mr. Kalijarvi opposed the bill because, *inter alia:*

> The provisions of S. 3233 would broaden and intensify the scope of cargo-preference provisions contained in existing legislation. *This bill would encompass not only those forms of aid cargoes already covered but also stockpile materials offshore procurement, surplus agricultural commodities and even goods procurred through the guarantee of or advance of founds [sic] or credits for, [sic] the convertibility of foreign currencies.*

*Id.* at 11 (emphasis added).

Defendants highlight the following exchange between Senator Butler and Mr. Kalijarvi, arguing that it demonstrates that the Act was designed to be limited to for-

eign aid or government procurement transport.

Mr. Kalijarvi: ... The Department believes that the enactment into permanent legislation of the principles contained in this bill, or for that matter any permanent cargo-preference legislation, will encourage foreign countries to make further application of the 50–50 principle to commercial cargoes.

Senator Butler: Do you mean to tell me we have no way of dealing with that situation? Are we perfectly helpless? Can't we say, "We are giving this stuff to you and if you are not reasonable enough to let us handle 50 percent of it, if you are going to put restrictions on us, we will put restrictions on you"?

Mr. Kalijarvi: I am talking about the commercial aspects of this thing. I am not talking about the aid aspects.

Senator Butler: This bill does not have anything to do with the commercial aspects, does it?

Mr. Kalijarvi: This bill applies generally to the whole concept of transportation.

*Id.* In effect what has occurred here is a misunderstanding between Senator Butler and Mr. Kalijarvi. Mr. Kalijarvi's concern over the bill was with the non-aid aspects of S. 3233, while Senator Butler believed that Mr. Kalijarvi thought that the bill somehow encompassed commercial transactions where there is no government involvement through foreign aid, advancing funds, providing credit, or guaranteeing the convertibility of foreign currency. This is demonstrated by Senator Butler's opening remarks in calling the Subcommittee to order on the second day of hearings, May 13, 1954. In his remarks Senator Butler stated:

S. 3233 was introduced by me at the joint request of management and labor in the shipping industry. *Its purpose is to make permanent and all-inclusive the principle now embodied in the various foreign-aid bills that would assure to United States flag vessels at least 50 percent of cargoes financed in any way by Federal Funds.*

*Id.* at 31 (emphasis added).

On May 17, 1954, the Subcommittee held a third day of hearings on the proposed cargo preference legislation. On that date, the Subcommittee heard testimony from James B. Stuart, president of the American Tram Shipowners Association. During his testimony, Mr. Stuart stated:

As I understand the workings of existing legislation, our ships have been given 50 percent only of those cargoes shipped under the direction of Foreign Operations Administration [FOA] and its predecessor organizations which have originated in the United States.

We have been guaranteed by the 50–50 clauses of previous statutes only half of the cargoes shipped under these specific FOA administrated acts.

We believe that the provisions of the pending bill are far more desirable and more closely meet the needs of the American merchant marine in that *they extend the preference of American ships to at least 50 percent of all cargoes directly or indirectly financed by our Government.*

*Id.* at 84 (emphasis added).

Also on May 17, 1954, Francis T. Greene, Executive Vice President of the American Merchant Marine Institute, stated that:

At the outset, let me emphasize that S. 3233 does not seek to control the routing of commercial cargoes. It does not seek to burden or impede the ocean transport of national defense cargoes. It does not relate to convertibility of United States investments abroad.

*It is directed solely to cargoes which directly or indirectly, are generated by our Government and paid for or financed by the American people.*

*Id.* at 96 (emphasis added).

On May 24, 1954, the last day of hearings, the Subcommittee heard from Hoyt S. Haddock, representing the Conference of American Maritime Unions. Mr. Haddock testified that the unions were in favor of S. 3233 because it "would amend the Mer-

chant Marine Act of 1936 to provide permanent legislation requiring American bottoms to carry at least 50 percent of foreign aid cargoes, cargoes financed by our Government and cargoes for which our Government guarantees the convertibility of foreign currencies." *Id.* at 118.

In the Senate Report accompanying S. 3233, the Committee stated that the bill covered government-financed cargoes.

> [T]he bill as reported would provide that "the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 percent" of any ... commodities procured, contracted for or otherwise obtained by the United States Government anywhere in the world, for its own account, or to be furnished or given to any foreign government, or financed, shall be transported in privately owned United States merchant vessels....

Senate Report at 1.

On June 15, 1954, the date on which the bill was passed, Senator Butler, in a prepared statement, said: "S. 3233, the cargo preference bill, ... would broaden and make permanent provisions now in 7 foreign aid and military assistance statutes to require shipment in United States-flag vessels of at least 50 percent of foreign aid and other federally owned or financed ocean cargoes." 100 Cong.Rec. 8227. He further stated that the bill "plugs existing loopholes, particularly with respect to offshore purchasing, and programs financed in any way by Federal funds." *Id.* at 8228.

The Court must note that during first call of the bill, on that date, Senator Butler stated that "[t]he bill covers only cargoes which are being paid for or owned by the Government. It has nothing to do with any other commerce of the United States. It applies only to giveaway and United States owned cargoes." *Id.* at 8227.

Defendants argue that this statement demonstrates that the bill was intended only to cover foreign aid or United States procurement cargoes. The Court does not find the same meaning to the above-quoted language. Again, Senator Butler is con-

cerned that his colleagues are not confused into believing that S. 3233 somehow involved private transactions which were strictly commercial in nature without the participation of the United States Government or its money.

S. 3233, as passed by the Senate, was also considered by the House of Representatives. There, many of the same issues and perceptions which were addressed in the Senate Subcommittee hearings, also were addressed in the hearings before the House Committee on Merchant Marine and Fisheries (the "House Committee"). Just as in the Senate Subcommittee hearings, the State Department sent a representative, Harvey Klemmer, Acting Director, Office of Transport and Communications Policy, to address the House Committee and discuss the Department's opposition and concerns to S. 3233. In reviewing the discourse between Congressman Thor Tollefson and Mr. Klemmer, the Court finds it particularly instructive as to the question of whether Congress intended cargo preference legislation to extend beyond simply foreign aid or government procurement cargoes. Mr. Klemmer was concerned that the bill extended far beyond the foreign aid cargoes that enjoyed preferences into the "twilight zone" cargoes and then into strictly commercial cargoes.

Mr. Tollefson: You make reference in your statement to cargo preference. All the bill asks for is the carriage of American sponsored cargoes to the extent of 50 percent in American-flag ships. Now, you say that is a preference—that we prefer our ships to those from the foreign nations if we are willing to give them half of our cargo.

Mr. Klemmer: What we are up against in this situation is this: first off I believe the American ships are getting half now.... The problem is if we apply it only to aid cargoes the next thing you know it is in the twilight zone field. There is a vague twilight zone in cargoes all over the world.

First you have outright aid cargoes; then you have cargoes which result from

the Government making a loan, which is covered by Public Resolution No. 17; the next thing is you have private banks making a loan, but the Government guarantees the loan; and you have the situation where the Government makes an arrangement for a loan which is then floated through private banks. Those are all Government-stimulated cargoes in a way. Then you go a little further into the twilight zone and you have a situation such as we are up against now with a certain foreign country, where this country is buying agricultural machinery in the United States ... which the American manufacturers were very anxious to get in competition with European manufacturers; and they were not in a position to insist on a shipping position. So this foreign country imports this agricultural machinery in its own vessels because its government owned their cargo. But we then discover they are selling the agricultural machinery to private farmers.

Waterborne Cargoes in United States-Flag Vessels: Hearings on S. 3233 Before the House Committee on Merchant Marine and Fisheries, 83d Cong., 2d Sess. at 38–39 (1954). After some discussion, Congressman Herbert Bonner attempted to clarify the scope of S. 3233 by stating, "[t]his does not have anything to do with the general commercial transactions of the nation. This only deals with what we are giving away, and what we sell on loose credit...." *Id.* at 43. Later in his discourse with Mr. Klemmer, he stated:

I am merely bringing this up, and still dwell on the fact that here we are giving something away or selling on loose credit—credit that you and I would not go into—and I just don't see how you can argue that it isn't fair or right, that it interferes with any other negotiated activity.

*Id.* Mr. Klemmer, however, was not convinced with Congressman Bonner's expla-

nation and stated that, "[w]e don't think it is wise because [cargo preferences are] spreading all over the world. [They are] spreading into twilight zones and into commercial cargo." *Id.* at 43–44.

Throughout the hearings of the House Committee, a number of witnesses concluded that the scope of S. 3233 would cover American cargoes financed in any way by the Government. *See id.* at 63–64, Statement of Donald G. Ward on behalf of the Chamber of Commerce of the United States ("[We] support ... the objective of S. 3233 which is to assure that at least 50 percent of the United States Government-financed cargo is carried in American vessels."); *id.* at 98, Statement of Francis Greene ("the bill would apply the 50–50 principle to Government-loan cargoes; that is, cargoes, the sale and export of which is financed by Government loans").

In the House Report accompanying S. 3233, adopted by the House Committee, the Committee stated the bill applies

in four situations: (1) Where the United States procures, contracts, or otherwise obtains for its own account equipment, materials, or commodities; (2) furnishes equipment, materials, or commodities to or for the account of any foreign nation without provision for reimbursement; (3) advances funds or credits; or (4) guarantees the the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities.

House Report at 1–2, U.S.Code Cong. & Admin.News 1954, p. 3173. The Committee specifically stated that S. 3233 "has no application to purely commercial transactions where a broker or exporter sells to a firm abroad without the participation of the United States Government." *Id.* at 2, U.S. Code Cong. & Admin.News 1954, p. 3173.

S. 3233 was passed by the House of Representatives with one minor amendment not related to an issue in this case.[1] The Senate then again passed the bill. It

---

**1.** That amendment excluded the operations of the Panama Canal Company from the Act's pro- visions.

was signed into law by President Eisenhower on August 26, 1954. *See* 68 Stat. 832 (1954).

Defendants argue throughout this case that the Cargo Preference Act is limited in scope to exclusively foreign aid and government-procurement cargoes. They make this argument largely because of the continued references to foreign aid throughout the legislative history of the Act. As demonstrated above, defendants' argument is without merit. Both Houses of Congress envisioned S. 3233 to go far beyond foreign aid or government-procurement cargoes. The continual references to foreign aid throughout the legislative history of the Act can be explained simply because, at the time S. 3233 was considered by Congress, most government export programs involving agricultural commodities were essentially foreign aid in nature. The number of references to foreign aid, however, cannot be read to mean the Act was somehow intended to be limited to such government-sponsored cargoes, particularly when the phrase "foreign aid" does not appear anywhere in the text of the Act.

*Attorney General's Opinion*

■ Defendants argue that pursuant to Attorney General Robert F. Kennedy's opinion, 42 Op.Att'y.Gen. 203 (1963), the Cargo Preference Act was designed to be limited to foreign aid or concessional export programs. Before addressing this argument, the Court notes that opinions of the Attorney General are not binding on the courts. *Perkins v. Elg*, 307 U.S. 325, 349, 59 S.Ct. 884, 896, 83 L.Ed. 1320 (1939); *see also Pueblo of Taos v. Andrus*, 475 F.Supp. 359, 365 n. 1 (D.D.C.1979) ("the Attorney General's opinion is not the judgment of a court of law and cannot operate to change the result arrived at through considered judicial interpretation").

In February of 1963, the Attorney General was asked whether certain foreign-aid programs fall within the terms of the Cargo Preference Act. In examining the Attorney General's opinion, defendants rely on the following language:

If your Department sells surplus agricultural commodities to a domestic exporter for export purposes under a program designed to dispose of the goods on the best possible terms and conditions, the resulting export is a purely commercial transaction in the language of the House Report and, hence, not subject to the Cargo Preference Act even if the United States advances credit to the exporter and the ultimate purchaser is a foreign government. On the other hand, if the sale is made pursuant to a program the purpose of which is in substantial part to assist the economy of the country to which the commodities are exported and where, consequently, the terms of the sale are more favorable to the purchaser than they would be in a normal business transaction, the sale cannot be regarded as a purely commercial transaction in the words of the House Committee; it would be a "giveaway" in the sense in which the term apparently was used by Senator Butler.... Accordingly, if the United States advances credit or guarantees the convertibility of currencies in connection with such a sale, the commodities involved come within the scope of the Cargo Preference Act.

42 Op. Att'y Gen. at 214 (footnotes omitted). Defendants contend that this paragraph supports the notion that the Cargo Preference Act is limited strictly in application to those sales that involve foreign aid or concessional programs.

It is the Court's determination that this language cannot be read so broadly. The first sentence of the above language means that when USDA sells surplus commodities to an American exporter and he, in turn, sells it abroad on a commercial basis "on the best possible terms" such a transaction would not be covered under the Act. *Id.* The second sentence states that when foreign sales are made pursuant to a program where its principle purpose is to assist the economy of the exporting country and where the sale terms are more favorable to a purchaser than in a standard business transaction, it cannot be regarded as purely a business transaction and falls within the

terms of the Act. The third sentence concludes that the Act would apply to such a sale if the United States participates in the sale by "advanc[ing] or guarantee[ing] the convertibility of currencies in connection with such a sale." *Id.*

■ Certainly, when the Attorney General is asked to determine the applicability of the Act to a foreign aid program, he would refer to those kinds of programs in interpreting the Act. The issue to be resolved in the Attorney General's opinion was not whether a foreign aid purpose was required before the Act would apply, but whether the sales of commodities at issue could be regarded as purely private commercial transactions which are outside the scope of the Act. The opinion cannot be read to mean that additional criteria, not stated in the Act or its legislative history, must be satisfied before the Cargo Preference Act may apply to a specific export program. It is the Court's determination that so long as the United States participates in the export sale as prescribed by the Act, these sales are subject to its provisions.

Further, the Court finds that even if the Attorney General's opinion were read to mean that the Act was limited to foreign aid or concessional export programs and the Court were somehow required to adopt that reasoning, the Cargo Preference Act would still apply to the Blended Credit Program.

As noted above, under the terms of the Program, the CCC extends interest-free credit on 20 percent of each covered sale as distinguished from any standard commercial transaction. The effect of these favorable and noncommercial terms is that the parties enjoy the benefit of interest rates 2 percent below prevailing U.S. commercial market values. As observed by Attorney General Kennedy, a program cannot be of "a purely commercial nature" if it "provides for a low rate of interest, comparable to that of Government obligations, and for the payment of the purchase price in installments extending over twenty years. Genuinely commercial transactions would not normally grant such long-term credit for agricultural commodities nor provide for such low interest rates." *Id.* at 215.

The Government also provides certain protections which normally would not be afforded to parties in a purely commercial transaction. For example, the exportation is completely protected against default or any commercial risk of nonpayment. Further, the Government's involvement in helping negotiate agreements with foreign governments prevents this program from being considered as strictly a commercial transaction. Therefore, these sales pursuant to the Blended Credit Program may be considered concessional and so the Act would apply even if the Court were to accept defendants' interpretation as to its coverage.

### Applicability of the Cargo Preference Act to the Blended Credit Program

As described above, the CCC, through the Blended Credit Program, provides "credits" or "advance[s] funds" to both the American exporter and the foreign importer. Under the GSM–5 portion of a Program sale, the CCC, after delivery of the exported commodities, purchases, for cash, the exporter's account receivable as to 20 percent of the sale. The CCC's payment to the American exporter literally "advance[s] funds" in connection with the sale of agricultural commodities to foreign nations. At the same time, under the GSM–5 portion of the Program, by assuming the risk of nonpayment by the foreign importer and its obligator banks, the CCC extends "credit[ ]" to the importer. Defendants "do not dispute that the portion of the program referred to as GSM–5, which averages between 15 and 20% of the total program, advances credit." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 4.

Defendants contend, however, that the remaining portion of the Program under GSM–102 provides no credit nor guarantees of the convertibility of foreign currency within the meaning of the Act and therefore the Program, as implemented, does not apply to the Cargo Preference Act.

Defendants' contention is without merit. Because there is no dispute that the GSM–5 portion of the Program "advances credit", *id.*, the Program as a whole must be considered to fall within the terms of the Act. Under the Blended Credit Program, "[r]egistration of the GSM–5 and GSM–102 portions of a given contract must take place at the same time and prior to export." Defendants' Motion to Dismiss or for Summary Judgment, Exhibit 5 at 1 ("Defendants' Exhibit"); Plaintiffs' Exhibit 1 at 1. The GSM–5 portion is not to be shipped before the GSM–102 portion. Defendants' Exhibit 5 at 1; Plaintiffs' Exhibit 1 at 1. Before the CCC may disburse any GSM–5 funds, the U.S. exporter must present a certification stating that the GSM–102 portion of the contract has been shipped. Defendants' Exhibit 5 at 2; Plaintiffs' Exhibit 1 at 2. The Blended Credit Program is devised and administered as a single indivisible program. To claim that the Cargo Preference Act applies only to the GSM–5 portion of the Blended Credit sales would be inconsistent with the Program. The Court will accordingly look at the Blended Credit Program as a single, unitary program where the CCC "advance[s] funds" and provides "credit[ ]" to foreign importers and American exporters.

Even if the Court were obliged to examine the GSM–102 portion of the Program to determine whether it falls within the terms of the Cargo Preference Act, the Court would conclude that it so applies.

Under GSM–102, the CCC guarantees payment by the foreign importer or its bank to the American exporter or its assignee. By accepting the risk of the foreign importer's or its banks' nonpayment, the CCC stands in the position of a standby debtor providing to the American exporter a guarantee of payment. This payment guarantee in connection with the GSM–102 portion of the Program sales must be considered as a guarantee letter of credit. Although not necessarily applicable, the Uniform Commercial Code ("U.C.C.") defines a letter of credit as "an engagement by a bank or other person ... that the issuer will honor drafts or other demands for payment upon compliance with the condition specified in the [letter of] credit." U.C.C. § 5–103(1)(a) (1977).[2] Accordingly, the Court also finds that the GSM–102 portion of the Blended Credit Program falls within the literal meaning of the Cargo Preference Act.

*MARAD's and DOT's Prior Position as to the Applicability of the Cargo Preference Act to the Blended Credit Program*

■ Prior to July 27, 1983, MARAD had taken the position that the Cargo Preference Act applied to the Blended Credit Program. *See* Plaintiffs' Exhibits 2–13. For example, in a letter dated January 26, 1983, to Richard A. Smith, Administrator, Foreign Agricultural Service, USDA, defendant Shear stated that:

> Both [the Cargo Preference Act] and its legislative history indicate that the ocean transportation of goods purchased with the assistance of Federal credits is covered by the U.S.-flag requirement of the statute. The statute is applicable where the United States "advances funds or credits," encompassing nonreimbursable as well as reimbursable advances.

Plaintiffs' Exhibit 3 at 2. Certainly it is not unreasonable for this Court to make this same conclusion, particularly after it has reviewed extensively the legislative history of the Act, the Attorney General's opinion as to its meaning, and its plain language incorporated in the statute.[3] For the reasons outlined above, the Court concludes that the Cargo Preference Act applies to the Blended Credit Program.

---

**2.** Although this Court does not find that the U.C.C. applies to the Blended Credit Program, it finds it a valuable authoritative source on the meaning of commercial terms, particularly when the Cargo Preference Act does not define "advance funds" or "credits."

**3.** The Court observes, in passing, that when the Department of Treasury announced that it was considering guaranteeing certain loans made to the Chrysler Corporation by private lending institutions for its "bail out," it determined that the Cargo Preference Act applied to any imports or exports made by Chrysler. It subsequently included a cargo preference provision in the loan guarantee agreement. *See* Plaintiffs' Exhibit 14 at 2.

*Necessary and Practicable Clause*

As stated above, the Cargo Preference Act requires that government agencies

shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such ... commodities ..., which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such a manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas....

46 U.S.C. § 1241(b)(1). Defendants argue that the "necessary and practicable" clause of the Act provides for an exception to the general requirement that at least 50 percent of the statutory cargoes be shipped on U.S.-flag vessels. They argue that when the costs of U.S.-flag shipment would offset any benefits that the program might promote, they are permitted to ignore the terms of the statute and not implement the 50-percent cargo preference. The Court finds that defendants' position is without merit and, therefore, finds them to be in violation of the Cargo Preference Act.

In coming to this conclusion, the Court again looks to the legislative history and to the purposes of the Act. When S. 3233 was under consideration in Congress, both Houses recognized that any cargo-preference requirement would be more costly than if commodities were shipped by foreign-flag vessels. The very reason for the Cargo Preference Act was the recognition by the Congress that without such preferences, U.S.-flag vessels would be unable to compete with foreign-flag vessels. As the bill's sponsor, Senator Butler, stated at the commencement of the hearings for the cargo preference legislation: "It is all too apparent that American shipping is fighting a losing battle against low-cost foreign competition." Senate Hearings at 1. *Accord id.* at 13; House Report at 1. Because the very purpose of the Act was to ensure that a substantial portion of cargoes shipped under government programs would be carried on generally more expensive U.S.-flag vessels, it would make little sense to read that legislation as exempting programs from cargo preferences simply because of higher costs. If the very reason for the Act were to reserve cargo for U.S.-flag vessels, which would not otherwise be available because of higher shipping costs, it would be contrary to the purposes of the Act to exempt transactions from the 50-percent requirement when enforcement of that provision would make transport of government-financed cargoes more costly.

In examining defendants' argument, it is difficult for the Court to understand why Congress would enact legislation establishing a cargo preference to help protect the higher-cost American maritime industry, but at the same time permit agencies to ignore that preference when there are less expensive ways of shipping government-financed cargoes. Further, if the Court were to accept the argument that defendants are only required to apply the preference when it is "practicable"; that is, when there is no cost differential, there would be no need to enact cargo preference legislation. If shipping costs were the same for U.S.-flag vessels and foreign-flag vessels, the Cargo Preference Act would have been completely unnecessary.

When Congress enacted S. 3233, it specifically addressed the cost issue. The 50-percent rule is subject to the availability of U.S.-flag vessels "at fair and reasonable rates for United States-flag commercial vessels...." 46 U.S.C. § 1241(b)(1). For Congress to make reasonable U.S.-flag vessel rates one of the criteria to be met when applying the 50-percent requirement, it follows that it did not also intend to allow departure from that rule whenever foreign-flag vessels could be attained at a lower cost. Despite the extensive testimony in opposition to the bill because of increased cost, *see* House Hearings at 3 (Statement of Admiral Francis C. Denebrink, United States Navy, Commander Military Sea Transportation Service); 29 (Statement of Arthur G. Syran, Director, Office of Transportation, Foreign Operations Office); 120–122 (Statement of John C. White, Counsel,

American Cotton Shippers Association), there is no suggestion in the legislative history that the "necessary and practicable" clause could be interpreted to overcome increased cost objections.

In the House hearings Mr. Klemmer of the Department of State questioned the "wisdom" of applying the 50-percent rule to programs that foster the sale of agricultural surpluses. *Id.* at 53. He believed that such a requirement might reduce the chances of selling such commodities abroad and, therefore, interfere with that export program. Later, during the hearings, Congressman Bonner restated that concern. *See id.* at 107. Congressmen Bonner and Dies considered an amendment to S. 3233 which would exempt sales of surplus commodities from the 50-percent requirement, *see id.* at 110, 113–14, but no such amendment was ever offered. It is reasonable to conclude that the House Committee must have intended the 50-percent requirement to apply to sales of surplus commodities, regardless of the effect the higher costs of U.S.-flag shipments might have on those exports.

In Attorney General Kennedy's opinion, 42 Op. Att'y Gen. 203, the Attorney General concluded that the abandonment of Congressman Bonner's suggestion that an amendment be offered to the legislation, demonstrated that Congress intended the 50-percent requirement to apply despite the potentially adverse effect it might have upon export sales of commodities. The Attorney General states:

> The discussions of the Cargo Preference Act before the House Committee ... show a recognition of the fact that the act would cover the shipment of commodities. It was realized that the cargo preference requirement with respect to the disposition of agricultural surplus commodities under Public Law 480 would increase the ocean shipping charges. Nevertheless, a suggestion by Representative Herbert C. Bonner ... that shipment under Public Law 480 be excluded from the Cargo Preference Act was abandoned.*

---

* In view of this decision of the Committee to disregard the potential adverse effect of cargo

preference on sales under Public Law 480, I cannot draw any legal inference from the contention that the applicability of the Cargo Preference Act to Title IV transactions would increase the cost of overseas transportation and thus interfere with the surplus disposal program....

*Id.* at 210 (some footnotes omitted).

In 1954, Attorney General Herbert Brownell, Jr. reached the same conclusion:

> In sum, while the applicability of the 50 percent preference to the Title I Public Law 480 program, as administered, seems beyond cavil fully consistent with the purpose of [the Cargo Preference Act], it is by no means clear that it is inconsistent with the declared foreign trade development policy of Public Law 480. This seems so, because under the program, as it is to be applied, such preference would result in no dollar drain on the dollar reserves of importing nations for transportation costs in American bottoms, since such dollar costs will be paid by the United States. However, even if it were to be regarded in any degree inconsistent, my conclusion would not be altered by reason of the fact that, as hereinabove discussed, the Congress has already provided for the applicability of such preference to programs comparable in purpose, operation, and dollar finance.

41 Op.Att'y Gen. 192, 199 (1954). It is plain from these decisions that the increased costs of applying the 50-percent preference requirement is not a legitimate or lawful reason for not applying the Act.

Defendants argue that if the "necessary and practicable" clause does not mean that an agency has discretion whether to apply the Act or not based on cost, then it has no meaning in the statute at all. The Court again disagrees with defendants' assertion. The "necessary and practicable" clause was designed to provide flexibility to the Act to permit agencies in limited circumstances to fall below the 50-percent requirement. As the Act's sponsor, Senator Butler noted in discussing the amendment which included the "necessary and practicable" clause: "The unequivocal provision for shipment of at least 50 per-

cent of all aid or federally owned or financed cargoes was softened to require only such steps as may be reasonable and practicable to assure shipment of at least 50 percent in American bottoms." 100 Cong.Rec. 8228. *See also* House Hearings at 97 (Statement of Francis Greene (the Act "would not be a rigid or inflexible law, because flexible provisions are written into it which we think can take care of all practical problems in its administration which may arrive").

This flexibility could arise in three circumstances. First, it may not always be feasible, in a given instance, to implement the 50-percent requirement in each geographic area. This is exactly what Mr. Greene was referring to in his prepared statement while addressing the Act's flexibility provisions.

The bill contains ... flexibility provisions to facilitate the application of its principles to the variety of ocean-transportation conditions and types of aid transactions which may be encountered. The first is the integral requirement that "such steps as may be necessary and practicable" need be taken to assure 50 percent private American-flag carriage in such manner "as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas." If in any given instance application of the 50–50 principle is in fact impossible or impracticable, then, by the very terms of the bill, its requirements will not apply.

*Id.* at 94. By having this "necessary and practicable" clause, agencies are not bound to *always* apply the 50-percent requirement where it would not be reasonable to do so in a particular geographic area.

Another area where the "necessary and practicable" clause could apply is in the area of offshore procurement. In the Senate Report, the Committee rejected the advice of those who urged Congress not to extend cargo preference legislation to offshore procurement. It reasoned,

insofar as offshore purchasing is concerned, the committee was more impressed by the testimony of A.J. Walsh, Commissioner, Emergency Procurement Service, General Services Administration, who stated that "the extension of the (50–50) rule to so-called offshore procurement for foreign aid would not, we think, create any difficulties insofar as our operations are concerned provided the bill is modified to assure" * * * flexibility.

Senate Report at 4. Here the Senate Committee was noting that, despite certain governmental officials' concern that the Act encompassed government procurement and that this might lead to difficulties of administration, they believed that the flexibility of the Act, as described by Mr. Walsh, in unforeseen emergency situations, would overcome any such objection. *Id.*

Finally, the third area where the "necessary and practicable" clause could apply is when an agency is faced with routine problems which may arise from day to day. The flexibility provisions of the Act simply recognize the realities of agency administration and the recurring difficulties that may emerge when implementing any program. To establish an absolute preference without providing agencies with a limited amount of flexibility would make the Act essentially unworkable.

▆▆▆ Whatever the exact perimeters of the "necessary and practicable" clause may be, there is no support for the conclusion that Congress intended to exclude from the requirements of the Act an entire program, which was developed and implemented by USDA, simply because the price of shipping on American vessels costs more. The Act was designed to "plug[ ] existing loopholes, particularly with regard to ... programs financed in any way by Federal Funds." Senate Report at 5.

▆▆▆ Defendants argue that if the Court were to require them to apply the Cargo Preference Act to the Blended Credit Program any and all benefits that might arise from the Program would be negated by the cost differential between U.S.-flag ships and their foreign counterparts. The Court notes, however, that defendants are under no requirement under law to develop the Program as they did. As far as what has been presented to this Court by defendants, it sees no legal impediment which

might limit defendants in their allocation of funds. Defendants' failure to allocate funds properly, to finance the increased cost of U.S.-flag cargoes when developing the Blended Credit Program, constitutes a failure to take all "necessary and practicable" steps to assure compliance with the Cargo Preference Act. They, therefore, are in violation of the Act.

## CONCLUSION

■ Because the Court finds that defendants DOT, MARAD, and USDA are in violation of the Cargo Preference Act by failing to apply the Act to the Blended Credit Program, it further finds the said failure to comply with the Act is unlawful and beyond the scope of defendants' legal authority and, therefore, is arbitrary, capricious, and an abuse of discretion. Accordingly, judgment is entered in favor of plaintiffs and plaintiff-intervenors, granting them a remedy in the form of injunctive and declaratory relief.