CITY OF MILWAUKEE, WISCONSIN,
et al., Plaintiffs,

v.

John R. BLOCK, in his capacity as Secretary of the United States Department of Agriculture and as Chairman of the USDA's Commodity Credit Corporation, et al., Defendants.

No. 85–C–1509.

United States District Court,
E.D. Wisconsin.

April 30, 1986.

Robert E. Jensen, George D. Baker and John J. McMackin, Jr., Williams & Jensen, P.C., Washington, D.C., for plaintiffs.

Mark Pogue, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

Jonathan Blank, and Kathryn P. Broderick, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., for intervenors.

## DECISION AND ORDER

WARREN, District Judge.

Plaintiffs commenced this action on October 28, 1985, seeking declaratory judgment and injunctive relief against the government defendants' allegedly unlawful and unconstitutional interpretation and application of the Cargo Preference Act of 1954, as amended, 46 U.S.C. § 1241(b) (West Supp.1985) ("the CPA"), and their failure to follow their own regulations, rules and policies governing the CPA's application to Title II of the Agricultural Trade Development and Assistance Act of 1954, as amended, 7 U.S.C. §§ 1721–1726 (1970 West Supp.1985) ("Title II" or "Title II, P.L. 480"). Pursuant to the requests of all parties, the Court on December 13, 1985, established an expedited schedule for the briefing and argument of the parties' cross motions for summary judgment. Finally, on February 7, 1986, after hearing argument and over the plaintiffs' objection, the Court granted the motion to intervene as defendants submitted by five parties asserting interests in the U.S. maritime industry ("Defendant-Intervenors").

Rule 56(c) of the Federal Rules of Civil Procedure provides for the granting of summary judgment where there exists "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." As more fully described below, the Court hereby finds that there exists no factual issue regarding plaintiffs' lack of standing to bring this action thereby entitling defendants to judgment as a matter of law.

## BACKGROUND

### I. The Parties.

The eighteen plaintiffs in this action include four operators of Great Lakes ports, six labor unions representing longshore-

men working the harbor facilities of various Great Lakes ports, four stevedoring service and terminal operating companies servicing various Great Lakes ports and one trade association representing ports, stevedores, terminal and warehousing companies, and steamship lines and agents involved in commercial ocean shipping in the Great Lakes.

The nine government defendants are officials of various federal agencies, sued in their official capacities, responsible for administering the provisions of Title II at issue in this case.

The five defendant-intervenors consist of four companies operating United States-flag vessels or organizations with member companies operating such vessels, and one labor union representing seamen working aboard United States-flag vessels engaged in the United States foreign and domestic shipping trade.

## II. Statutory and Regulatory Background.

### A. The Cargo Preference Act.

This lawsuit stems primarily from the parties' differing positions regarding the proper interpretation of the CPA. The CPA was enacted to foster and preserve a strong United States merchant marine by aiding United States-flag operators in their competition with lower cost foreign-flag vessels.[1] H.R.Rep. No. 2329, 83 Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin. News, 1954 p. 3173. The CPA seeks to achieve this purpose by requiring as follows:

> Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any ... commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such ... commodities, the appropriate agencies shall take such

steps as may be necessary and practicable to assure that at least 50 percentum of the gross tonnage of such ... commodities ... which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas....

46 U.S.C. § 1241(b)(1).

The CPA remained substantially unchanged for 30 years following its enactment until December 23, 1985—seven weeks after this lawsuit's commencement—when the President of the United States signed legislation, formally known as the "Food Security Act of 1985", amending the CPA. Pub.L. 99–198 (1985). Four provisions in this legislation pertain to this litigation. Specifically, in summarized fashion, these four provisions are as follows:

> i) The U.S.-flag participation goal for donated agricultural commodities is increased from 50 to 75 percent. The increase is to be phased in over a period of three years. Sec. 901(b)(a)(2).

> ii) The required level of U.S.-flag participation must be achieved in each 12-month period beginning April 1, 1986. Thus, the compliance year now begins when the Great Lakes' shipping season begins. Sec. 901(b)(c)(2)(A); Complaint ¶ 59.

> iii) The Secretary of Transportation is required, during the period 1986–1989, to take "such steps as may be necessary and practicable without detriment to any port range" to preserve the percentage share or metric tonnage of donated commodities exported from Great Lakes ports in 1984. Sec. 901(b)(C)(2)(B).

> iv) Congress has established a detailed scheme for financing the increased ocean

---

[1] "United States-flag vessels" are vessels documented in the United States and owned by United States citizens or entities. 46 U.S.C. § 1202.

freight charges which may result from the increased utilization of relatively expensive U.S.-flag vessels mandated by the CPA. Sec. 901(b)(d)–(f). Title XI, Subtitle C of Pub.L. 99–198 (1985) ("The 1985 Amendments").

## B. Title II, P.L. 480.

Title II, P.L. 480 embodies a foreign food donation program by which the United States donates agricultural commodities overseas to curb famine, combat malnutrition, and promote economic and community development in friendly developing countries. *See* 7 U.S.C. § 1721(a). The President of the United States is authorized to carry out the Title II, P.L. 480 program. *Id.* Section 1–201 of Executive Order 12220 delegates the Title II, P.L. 480 functions vested in the President to the Director of the United States International Development Cooperation Agency ("IDCA"). 45 Fed.Reg. 44245 (June 27, 1980). The IDCA has internally redelegated these functions to the Agency for International Development ("AID") who, in conjunction with the Commodity Credit Corporation ("CCC"),[2] administers the Title II, P.L. 480 program. In the Title II, P.L. 480 program, the CCC provides requested commodities for donation and pays the costs of acquiring, processing, packaging and transporting the donated commodities from the commodity supplier's plant to the foreign destination. 7 U.S.C. §§ 1721(a), 1723.

The CPA applies to the Title II, P.L. 480 program. Indeed, this litigation concerns whether the government defendants are properly applying the CPA in administering Title II, P.L. 480.

## C. CCC Procurement and Port Allocation Regulations.

The CCC's procedure used in procuring and allocating to ports the donated Title II, P.L. 480 commodities is published at 7 C.F.R. Part 1496. These regulations provide that, as a general principle, contracts for the procurement and allocation to ports will be awarded on the basis of "lowest landed cost." 7 C.F.R. § 1496.5(a). "Lowest landed cost" is defined as the lowest combined total cost of acquiring the commodities and transporting them to the port of export, plus shipping them across the ocean to the discharge port. 7 C.F.R. § 1496.3(g). However, the following "additional factors" may be considered in awarding contracts: the availability of ocean service, the adequacy of ocean service, port performance, and transit time. Regarding the availability of ocean service, 7 C.F.R. § 1496.5(b)(5) provides that:

> Available service will be analyzed to ensure that the port or coastal range selected for exportation has available ocean transportation service that will provide maximum compliance with the stated policy of AID with regard to the utilization of U.S. and other flag vessels to carry commodities shipped under Title II, Pub.L. 480.

In late 1985, at the time when defendants are accused of unlawfully diverting Title II, P.L. 480 commodities from Great Lakes ports, the stated policy of AID regarding "the utilization of U.S. and other flag vessels" was expressed in an August 3, 1984 letter from M. Peter McPherson, Administrator of AID, to Merril D. Marxman, Deputy Director for Commodity Operations, United States Department of Agriculture. This letter articulated the following AID policy:

> [W]e now request that you follow a policy of attempting to ensure that an absolute fifty percentum of all Title II cargo will be shipped on U.S.-flag vessels on a calendar year basis. This should be done by attempting to make up at other port ranges all tonnage shipped out of the Great Lakes, for which U.S.-flag ships were not available ... Cargo purchase and port allocation decisions will continue to be based on lowest landed cost, however, and cargo allocated to the Great

2. The CCC is a federally chartered corporation and instrumentality of the United States subject to the general supervision and direction of the Secretary of Agriculture. 15 U.S.C. §§ 714 *et seq.*

Lakes will not be diverted to other coastal ranges.

### III. The Challenged Cargo Diversions.

The underpinnings of this litigation stem from the decision of companies operating U.S.-flag vessels not to service the Great Lakes ports. Consequently, most shipments from Great Lakes ports are transported on foreign-flag vessels. The parties agree that if U.S.-flag vessels would choose to service these ports, they would be entitled to at least 50% of the Title II, P.L. 480 cargo provided that the rates charged were "fair and reasonable rates for United States-flag commercial vessels." 46 U.S.C. § 1241(b)(1).

In August and September of 1985, because of circumstances depressing the overall United States-flag participation rate in the Title II program, Title II, P.L. 480 cargo destined to Great Lakes ports pursuant to the lowest landed cost formula was diverted to coastal ranges serviced by United States-flag vessels. The basic problem requiring such diversion was United States-flag unavailability to Title II destinations, aggravated by increased Title II, P.L. 480 shipments to Africa—a destination serviced only to a limited extent by United States-flag vessels—for famine relief.

Two different diversion techniques were employed. First, commodities were purchased outside of the Midwest, at costs higher than lowest landed cost, and thus in a position for United States-flag transport at ports other than Great Lakes ports. Second, commodities purchased in the Midwest were shipped by rail to ports frequented by United States-flag vessels.

### DISCUSSION

The plaintiffs move for summary judgment arguing that the diversion of Title II, P.L. 480 cargo from the Great Lakes violates applicable agency regulations, the CPA, P.L. 480 and Article I, Section 9, Clause 6 of the United States Constitution ("the Port Preference Clause"). Defendants deny these allegations and counter-assert the legality of diverting cargo from the Great Lakes. Further, defendants advance three procedural arguments, any of which, if accepted by the Court, precludes review of the merits of plaintiffs' claims. Specifically, defendants argue that (1) the 1985 amendments to P.L. 480 render moot plaintiffs' request for declaratory relief and require dismissal of plaintiffs' claim for injunctive relief because of lack of ripeness; (2) the plaintiffs lack standing to prosecute this action; and (3) the CCC anti-injunction statute bars plaintiffs' action. As stated more fully below, the Court agrees that these plaintiffs lack standing to prosecute this action.

Article III of the United States Constitution confines the federal courts to adjudicating actual "cases" and "controversies." "[I]n terms of Article III limitation on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Data Processing Service v. Camp*, 397 U.S. 150, 151–52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1969) *quoting Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1967). To satisfy the Article III requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1978).

However, the standing requirement is not satisfied just by establishing the plaintiff's actual or threatened injury. Rather, in *Data Processing, supra,* the Supreme Court established a second, nonconstitutional requirement that the plaintiff's interest, regardless of its nature in the absolute, at least be "arguably within the zone of interests to be protected or regulated" by the statute or constitutional guarantee in question. 397 U.S. at 153, 90 S.Ct. at 829; *see Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1975). This "zone of interest test stems from the

prudential judicial policy of "self-restraint". *See Data Processing, supra,* 397 U.S. at 154, 90 S.Ct. at 830.

The zone of interest test focuses upon the proper relationship between the legislative and judicial branches of government. It serves the purpose of "allowing courts to define those instances where it believes the exercise of its power at the instigation of a particular party is not congruent with the mandate of a legislative branch in a particular subject area."

*Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.,* 658 F.2d 1182, 1195 (7th Cir. 1981).

In the present case, there exists no dispute that the plaintiffs' allegations satisfy the Article III injury component of standing. However, the parties dispute whether the plaintiffs' interests lie within the zone arguably sought to be protected or regulated by the CPA and Title II, P.L. 480. Accordingly, the Court proceeds to articulate the pertinent criteria employed in "zone of interest" analysis and applies them to the circumstances presented by the instant case.

To satisfy the "zone of interests" requirement, the statutory provision involved must arguably protect or regulate the particular interests asserted by the plaintiffs. *See Marshall & Ilsley Corp. v. Heimann,* 652 F.2d 685, 693 (7th Cir.1981). Specifically, the Court must "examine the language of the relevant statutory provision[s], the pertinent regulations, and the legislative history to discern the parameters of the relevant zone of interest and to determine whether the interest of plaintiffs arguably falls within the zone." *Alschuler v. Dept. of Housing & Urban Development,* 686 F.2d 472, 477 (7th Cir.1982).

### A. Plaintiffs' Claim Under the Cargo Preference Act.

A perusal of the CPA's legislative history reveals that this legislation's purpose is "to protect U.S.-flag vessels from competition from low-cost foreign flag vessels." *Transportation Institute v. Dole,* 603 F.Supp. 888, 896 (D.D.C.1985). As the

House Committee on Merchant Marine and Fisheries stated:

The purpose of the bill is to implement the policy established in the Merchant Marine Act, 1936, that the United States should have a merchant marine sufficient to carry a substantial portion of its waterborne export and foreign commerce. The higher American standard of living with the resultant higher operating costs to the American shipowner has made competition with low-cost foreign ships difficult, with the result that the proportion of cargoes carried in American bottoms has been constantly declining. From time to time there has been inserted in various foreign-aid bills a provision that at least half of the shipments be made in American flag-ships. The present bill serves to establish that principle on a permanent basis.

H.R.Rep. No. 2329, 83 Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin.News, 1954 p. 3173; *see also Cargo Preference Bill (50–50 Cargo): Hearings on S. 3233 Before a Subcomm. of the Senate Comm. on Interstate and Foreign Commerce,* 83d Cong., 2d Sess. (1954); *Waterborne Cargoes in United States-Flag Vessels: Hearings on S. 3233 Before the House Comm. on Merchant Marine and Fisheries,* 83d Cong., 2d Sess. (1954); 95 Cong.Rec. 438 (1949) (statement of Sen. Magnuson.)

Indeed, the plaintiffs readily concede that "one of the principle objectives Congress sought to achieve in enacting the CPA was to assist the United States-flag industry." *Plaintiffs Response to the Brief of Defendant-Intervenors in Support of Their Motion to Dismiss or for Summary Judgment* at 5–6. However, plaintiffs assert standing to pursue their claims under the CPA based on the following contentions: (1) plaintiffs are arguably regulated by the CPA, (2) the CPA was the product of a compromise between forces seeking to require all government-impelled cargo to be carried on United States-flag vessels and forces seeking to avail themselves of the less expensive foreign-flag vessels; and (3) the 1985 amendments re-

flect Congress' intent in enacting the CPA, and its corresponding availability limitations, to protect the interest of ports in avoiding cargo diversion.

Plaintiffs contend that the statutory framework of the CPA arguably regulates them. Specifically, plaintiffs argue, relying principally on *Cotovsky-Kaplan Physical Therapy Assoc. v. United States*, 507 F.2d 1363 (7th Cir.1975), that since the CPA burdens, controls or otherwise affects their interests that their interests lie within the statutory zone.

In *Cotovsky-Kaplan*, the plaintiffs, five professional physical therapy corporations, were permitted to challenge HEW regulations conditioning Medicare payments to home health agencies on their hiring of nonprofit physical therapy corporations. 507 F.2d at 1364–65. These regulations caused several home health agencies to notify plaintiffs of their intent to terminate their contracts. *Id.* In allowing the private corporations to challenge the regulations, even though they did not apply directly to them, the panel reasoned that where "a governmental agency regulates the contractual relationship between a regulated party and an unregulated party, the latter as well as the former may have interests that are arguably within the regulated zone for purposes of testing standing, and for this purpose a total prohibition is a form of regulation." *Id.*

The CPA's failure to directly regulate any party distinguishes the present case from *Cotovsky-Kaplan*. The CPA outlines various operational procedures employed where the United States procures equipment, materials or commodities and furnishes them to foreign nations. 46 U.S.C. § 1241(b)(1). Specifically, the United States must take steps ensuring that at least 50% of these items are shipped to the foreign nation by United States-flag vessels. *Id.* These statutory pronouncements do not regulate the United States-flag or foreign-flag maritime industries nor do they compel those industries' participation in any governmental programs. Rather, participants in programs subject to the CPA participate voluntarily. Consequently, plaintiffs cannot contend that direct regulation of the United States-flag maritime industry indirectly regulates the foreign-flag maritime industry plaintiffs. *See Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106, 1113 (4th Cir.1984). A statute designed to aid a domestic industry voluntarily participating in a governmental program does not arguably protect or regulate the interests of competing foreign industries also voluntarily participating in the program but who lie outside the statute's beneficient purview. The Court finds that the plaintiffs cannot base standing on their being arguably regulated by the CPA.[3]

Plaintiffs also argue that the CPA was the product of a compromise between those promoting United States-flag interests and those promoting the foreign-flag interests. Consequently, plaintiffs contend that the CPA embodies the interests of the foreign-flag plaintiffs. Plaintiffs offer no, nor is the Court aware of any, legislative history indicating that the CPA as it stands resulted at least partially from a desire to protect the interests of the foreign-flag maritime industry. Instead, as described above, the legislative history reveals that the CPA's purpose was to protect and promote the

---

**3.** Cases decided by the Seventh Circuit Court of Appeals subsequent to *Cotovsky-Kaplan* further compel this finding. In *Alschuler v. Dept. of Housing & Urban Development*, 686 F.2d 472, 480 (7th Cir.1982), the court held, *inter alia*, that plaintiffs—residents in a neighborhood in which a low-income housing project was approved by HUD—lacked standing to raise any complaint based on regulatory or statutory provisions "designed solely for the protection of residents of the [low income housing] complex." Similarly, in *Peoples Gas, Light & Coke Co. v. U.S. Postal* *Serv.*, 658 F.2d 1182, 1196 (7th Cir.1981), the court found that the plaintiff Gas Company lacked standing to pursue an action under the Postal Reorganization Act challenging the Postal Service's decision to invite bids to construct an electrically-powered plant to heat the Chicago Main Post Office. The panel reasoned that the Act was designed to protect the public's interest in efficient and economical postal service operations, an interest only tangentially related to plaintiff's competitive interests and outside of the Act's zone of interest. *Id.*

United States-flag maritime industry. The Court finds that the plaintiffs cannot base standing pursuant to this argument.

Finally, the plaintiffs contend that the 1985 amendments highlight the CPA's intent to protect the interests of ports against cargo diversions. The Court preliminarily notes that the plaintiffs do not contend that the substance of the 1985 amendments confers standing upon them. Indeed, this action was filed before the promulgation of these amendments.

The plaintiffs read too much into the 1985 amendments. Instead of clarifying the concerns of Congress in enacting the CPA, the 1985 amendments seemingly were intended to ameliorate the deleterious consequences to the Great Lakes ports resulting from the CCC's administration of Title II, P.L. 480. Consequently, the 1985 amendments do not aid plaintiffs' argument that the CPA was enacted to protect the Great Lakes ports. In conclusion, the Court finds that the plaintiffs lack standing to pursue this action based on the CPA.

### B. Plaintiffs' Claim Under Title II, P.L. 480

Determining that the plaintiffs cannot base standing to pursue this lawsuit on Title II, P.L. 480 involves similar, albeit clearer, analysis. Plaintiffs sufficiently allege an Article III injury. But, as with the CPA, plaintiffs' interests do not fall within the "zone of interests" arguably protected or regulated by Title II, P.L. 480. The purpose of Title II, P.L. 480 is succinctly stated at 7 U.S.C. § 1721(a):

> The President is authorized to determine requirements and furnish agricultural commodities, on behalf of the people of the United States of America, to meet famine or other urgent or extraordinary relief requirements; to combat malnutrition, especially in children; to promote economic and community development in friendly developing areas; and for needy persons and nonprofit school lunch and preschool feeding programs outside the United States....

The plaintiffs are not one of the stated parties on whose behalf the legislation was enacted. Nor do the plaintiffs compete with the stated parties—thereby rendering the "zone of interest" analysis regarding the statute more straightforward than that performed above regarding the CPA. Plaintiffs however contend that Title II, P.L. 480 "contemplates" transporting commodities from the United States to their overseas destination. 7 U.S.C. § 1723. Further, plaintiffs point out that cargo diversion by increasing transportation expenses reduces aid to the intended Title II, P.L. 480 beneficiaries.

The Court finds plaintiffs' attenuated position unpersuasive. First, of course legislation enacted to combat overseas famine necessarily contemplates transporting the relief to the needy persons abroad. However, such contemplation does not broaden the statute's "zone of interest" to include all entities and matters involved in achieving the statute's goal of reducing overseas famine. The "zone of interest" of Title II, P.L. 480 covers the interests of the persons for whom this legislation was promulgated. *Supra*, at n. 3 and accompanying text. Second, any complaint that attacks the defendants' administration of the Title II, P.L. 480 program can be lodged only by those entities whose interests lie within the statutory zone. Accordingly, the Court finds that plaintiffs lack standing to pursue this action based on Title II, P.L. 480. *Id.*

The finding that the plaintiffs lack standing to pursue this lawsuit under the CPA or Title II, P.L. 480 seems harsh considering that all parties agree that plaintiffs have been injured by the defendants' actions. However, as exemplified in the following quotations from appellate courts, the judiciary accedes in this harshness:

> Having failed to demonstrate a congressional intent to protect or regulate its competitive interests and thus satisfy the zone of interest requirement for standing, [plaintiff's] objection to the [defendant's] procurement decision is governed by the traditional doctrine of judicial non-interference in government procurement expressed in *Perkins v. Lukens Steel* ... that, "like private individu-

als and businesses, the Government enjoys the unrestricted power ... *to* determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."

*Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.*, 658 F.2d 1182, 1200 (7th Cir. 1981);

It may appear unjust that a zealous advocate, armed with concrete injury, should be barred from challenging an executive action that it finds unlawful: undeniably, the zone test operates here against a plaintiff that is in many respects a traditional type of litigant.... But every executive action portends endless adverse impacts and infinite adverse ramifications. We decline to convert the zone of interests test to one that calibrates zones of impact or zones of consequence [citation omitted]. The zone of interest test is a construct that permits government officials to act in furtherance of congressional purposes without the prospect of protracted court challenges from those whose interests Congress clearly did not protect.... It is appropriate that this matter be resolved in the halls of Congress and the Department of Agriculture, not in the courtrooms of our country.

*Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106, 1116 (4th Cir.1984).[4]

The Court hereby GRANTS summary judgment in defendants' favor.

---

**4.** The Court need not determine whether the plaintiffs possess standing to challenge the defendants' regulatory actions under the Administrative Procedure Act ("APA") since when pursuing a cause of action based on the APA plaintiffs must establish standing pursuant to the subject statute or statutes. *South East Lake View, Etc.* *v. Dept. of Housing,* 685 F.2d 1027, 1033 n. 5 (7th Cir.1982). Likewise, plaintiffs lack standing to pursue their constitutional claim alleging that the defendants' administration of the Title II, P.L. 480 program violates the Port Preference Clause.