CITY OF MILWAUKEE, et al.,
Plaintiffs-Appellants,

v.

John R. BLOCK, Secretary of Agriculture, et al., Defendants-Appellees.

No. 86–2087.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1987.

Decided July 14, 1987.

Grant F. Langley, City Atty., Milwaukee, Wis., George D. Baker, Williams & Jensen, P.C., Washington, D.C., for plaintiffs-appellants.

Jonathan Blank, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., Christine R. Whittaker, Civil Div., Dept. of Justice, Washington, D.C., for defendants-appellees.

Before WOOD and FLAUM, Circuit Judges, and GRANT, Senior District Judge.[*]

FLAUM, Circuit Judge.

In *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court stated that parties have standing to challenge the legality or constitutionality of federal agency actions if they assert interests "arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question," *id.* at 153, 90 S.Ct. at 830. Our cases have interpreted this statement as a strict limitation on standing. Applying our previous decisions, the district court dismissed the present lawsuit for lack of standing. In light of the Supreme Court's recent decision in *Clarke v. Securities Industry Association*, ── U.S. ──, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), however, we conclude that our prior cases do not correctly reflect the Supreme Court's teaching in *Data Processing*, and that the judgment of the district court must, therefore, be reversed.

## I.

Title II of the Agricultural Trade Development and Assistance Act of 1954, 7

[*] The Honorable Robert A. Grant, Senior District Judge for the United States District Court for the Northern District of Indiana, is sitting by designation.

U.S.C. § 1721 et seq. (1982), established a program under which the United States government donates agricultural commodities to needy foreign nations. These commodities are purchased by the Commodity Credit Corporation (CCC), a federally-chartered corporation, and shipped abroad from ports throughout the United States. The Title II program is subject to the provisions of the Cargo Preference Act, 46 U.S.C. § 1241(b)(1) (1982), which requires that a significant portion of these commodities be shipped on United States-flag vessels.[1] The Title II program is also subject to CCC regulations governing the awarding of contracts for the purchase and shipment of the commodities.

The plaintiffs, who represent various interests involved in shipping Title II cargo from ports on the Great Lakes,[2] claim that the government defendants, who are responsible for administering the Title II program, have violated the Cargo Preference Act, the CCC regulations, and the Port Preference Clause of the United States Constitution, U.S. Const. Art. I § 9 cl. 6.[3] They brought this action, seeking both declaratory and injunctive relief. Five maritime defendants, who operate United States-flag vessels which serve ports outside the Great Lakes region, and who represent workers employed on these vessels, were later allowed to intervene.

### THE CARGO PREFERENCE ACT

The plaintiffs claim that the defendants have violated the Cargo Preference Act.

1. "United States-flag vessels" are vessels registered in the United States and owned by United States citizens or entities.

2. The eighteen plaintiffs in this action include four operators of Great Lakes ports; six labor unions representing longshoremen working at harbor facilities of various Great Lakes ports; four stevedoring service and terminal operation companies servicing various Great Lakes ports; two foreign-flag shippers and their agent; and one trade association representing ports, stevedores, terminal and warehousing companies, and steamship lines and agents involved in commercial ocean shipping in the Great Lakes.

3. The plaintiffs also allege that, in implementing the Title II program, the government defendants have: (1) violated their obligation under Title II to maximize the use of allocated funds to purchase commodities by misinterpreting the re-

The Act requires that, whenever the federal government contracts to purchase and transport agricultural commodities to overseas nations, as it does in the Title II program, the federal agencies involved (in this case the CCC) are to make certain that a minimum percentage of the commodities will be transported on "privately owned United States-flag commercial vessels, *to the extent such vessels are available* at fair and reasonable rates," 46 U.S.C. § 1241(b)(1) (1982) (emphasis added). At the time that this lawsuit was filed, the minimum percentage was 50% of the gross tonnage of all commodities donated by the federal government. *See id.*

The meaning of the words "to the extent such vessels are available"—the so-called Availability Clause—is at the center of this lawsuit. Private United States-flag commercial vessels do not serve the Great Lakes ports. The plaintiffs contend that because United States-flag ships are not "available" at the Great Lakes ports, these ports are exempt from the statutory minimum. They argue that the statutory minimum applies only at ports served by United States-flag vessels. The plaintiffs, therefore, seek to have the defendants ship the Title II commodities from ports in the Great Lakes region using foreign-flag shippers.

The government defendants have interpreted the Cargo Preference Act in a different manner. They contend that the

quirements of the Cargo Preference Act; (2) acted arbitrarily and capriciously and abused their discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 706 (1982); (3) acted beyond the scope of their authority in violation of § 706; and (4) violated the Due Process Clause of the Fifth Amendment.

We need address none of the above claims. The plaintiffs' Title II claim essentially restates their claim that the defendants have misconstrued the provisions of the Cargo Preference Act. The plaintiffs' Administrative Procedure Act claims add nothing to the complaint. Section 706 is not a substantive grant of rights to individuals. Rather, that section governs our standard of review. The plaintiffs did not pursue their due process claim before the district court.

Act's minimum percentage applies on a nationwide basis. In their view, if United States-flag ships are not available at the Great Lakes ports, then a sufficient amount of Title II commodities must be shipped through other domestic ports that are served by United States-flag ships in order to achieve the cargo preference percentage on a nationwide basis. As a result of their interpretation of the Act, the defendants have shipped less Title II cargo through the Great Lakes ports than they would have had they followed the plaintiffs' interpretation.

In December 1985, Congress amended the Cargo Preference Act. This amendment increased the portion of donated commodities to be shipped by United States-flag ships from 50% to 75%, with the increase to be phased in over a three-year period. *See* 46 U.S.C. § 1241f(a) (West Supp.1987). The legislation also provided that, despite the required increase in the use of United States-flag ships, the government was to maintain either the percentage share or the metric tonnage of Title II commodities shipped through the Great Lakes ports at its 1984 level. *See id.* at § 1241f(c).

### CCC REGULATIONS

In addition to their statutory claim, the plaintiffs assert that, in administering the Title II program, the defendants have not complied with the regulations promulgated by the CCC governing the awarding of contracts for the purchase and shipment of Title II commodities. At the time this suit was filed, these regulations provided that the CCC would award contracts based on the "lowest landed cost." The agency defined this as the lowest combined cost of purchasing the commodities, transporting them to a specific port, and shipping them to the recipient nation. *See* 7 C.F.R. 1496.-5(a) (1986). In 1984, the CCC specifically stated that Title II cargo allocated to the Great Lakes ports under the lowest landed cost method would not be diverted to other ports in order to meet the Cargo Preference Act percentage on a nationwide basis.

The plaintiffs contend that the defendant CCC has violated its own regulations. According to the plaintiffs, in August and September of 1985, the CCC diverted commodities, which under the lowest landed cost formula would have gone to the Great Lakes ports, to other ports. The agency allegedly diverted cargo in two ways. First, the agency purchased commodities outside the Great Lakes region, even though less expensive commodities were available within the region. These commodities were then shipped abroad from ports outside the Great Lakes region. Second, the agency purchased commodities within the Great Lakes region, transported them by rail to ports outside the region, and then shipped them abroad on United States-flag vessels, even though lower-cost foreign flag vessels were available within the Great Lakes region.

The CCC has recently promulgated new regulations governing the operation of the Title II program. Under these regulations, the CCC will continue to award purchase and shipping contracts using the lowest landed cost method. However, the CCC will now divide the bidding process into two steps. In the first step, the CCC will calculate the lowest landed cost using only higher-priced United States-flag ship rates for the portion of its commodities that it believes is necessary to meet its obligations under the Cargo Preference Act on a nationwide basis. *See* 52 Fed.Reg. 5726 (Feb. 25, 1987) (amending 7 C.F.R. § 1496.5(a)). In the second step, foreign-flag ships will be able to compete with United States-flag ships for the remaining cargo. Because no United States-flag ships serve the Great Lakes region, no cargo will be assigned to the Great Lakes ports in the first stage of the process. As a result, there will be no future diversions of Title II cargo which would otherwise go to the Great Lakes ports. The maritime defendants have suggested that this change renders the case moot.

### DISTRICT COURT DECISION

The plaintiffs filed this suit in October, 1985. They prayed for a declaration that the defendants' diversion of cargo had vio-

lated the Cargo Preference Act, the CCC's regulations, and the Port Preference Clause of the United States Constitution. The plaintiffs also sought a declaration that, because United States-flag ships are not available in the Great Lakes region, the minimum United States-flag percentage mandated by the Cargo Preference Act does not apply to Title II cargo shipped through the Great Lakes ports. Finally, the plaintiffs requested an injunction requiring the defendants to administer the Title II program in accordance with the requirements of the Cargo Preference Act and the CCC's regulations. The plaintiffs subsequently moved for summary judgment.

The defendants responded to the plaintiffs' motion by asserting that the plaintiffs lacked standing. Relying on previous decisions of this court, the district court sought to determine whether the plaintiffs had standing by scrutinizing whether they were within the "zone of interest" protected or regulated by the statutory and constitutional provisions at issue. The district court concluded that the plaintiffs did not have standing under the Cargo Preference Act to contest the defendants' interpretation of the act's Availability Clause because the clause did not "directly regulate" them or seek to "protect the[ir] interests." *City of Milwaukee v. Block*, 634 F.Supp. 760, 765 (E.D.Wis.1986). Although the court recognized that the 1985 amendment to the Cargo Preference Act was intended to mitigate the harsh effects of the Act on the Great Lakes ports, it held that this evidence was not relevant to the question of whether the plaintiffs were within the zone of interest of the Availability Clause. *See id.* at 766.[4] Based on its conclusion that the plaintiffs lacked standing, the district court granted summary judgment in favor of the defendants.

The plaintiffs appealed the decision of the district court. This case was set for oral argument on January 15, 1987. The day before, however, the Supreme Court announced its decision in *Clarke v. Securities Industry Association*, —— U.S. ——, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). *Clarke* provided the Court's most definitive explanation regarding standing to challenge administrative agency actions, and has required us to reexamine our previous decisions on this subject.

On February 25, 1987, while this case was under advisement, the CCC promulgated its new regulations providing for a two-step bidding process for Title II cargo. *See supra* at 1162–1163. The new CCC regulations were to be used to conduct the CCC's next monthly contract awarding process, scheduled to take place on March 10, 1987. On March 9, the plaintiffs asked this court to enjoin the CCC from using the new regulations to conduct the March contracting. In an unpublished order, we declined to do so. The following day, the maritime defendants moved to have this action dismissed on the ground that the CCC's new regulations had rendered the case moot.

## II.

We first address the maritime defendants' assertion that this case is moot. The maritime defendants argue that, under the CCC's new two-step procedure for awarding contracts, there will be no future diversion of cargo from the Great Lakes. They conclude that, as a result, there is no remaining controversy between the parties. In order to determine whether this case is moot, we must examine the claims that the plaintiffs make and the relief that they seek in order to resolve whether the parties will be "affected by any view [a] [c]ourt might express on the merits of this controversy." *DeFunis v. Odegaard*, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974).

We conclude that the plaintiffs' claim that the government defendants failed to comply with CCC regulations is

---

**4.** The district court also held that the plaintiffs lacked standing under Title II to object to the administration of that program because they were neither "one of the stated parties on whose behalf the legislation was enacted" nor in "com-

pet[ition] with the stated parties," *id.* The district court dismissed the plaintiff's Administrative Procedure Act and Port Preference Clause claims in a footnote. *See id.* at 767 n. 4.

moot. The allegedly-ignored regulations have been repealed; we have no reason to believe that the government defendants will not comply with their new guidelines. *See Kremens v. Bartley*, 431 U.S. 119, 129, 97 S.Ct. 1709, 1715, 52 L.Ed.2d 184 (1977); *Benkendorf v. Village of Hazel Crest*, 804 F.2d 99, 101 (7th Cir.1986).

 We also conclude, however, that the plaintiffs' claim that the defendants have misinterpreted the Cargo Preference Act, and their claim that the defendants' interpretation of the Act is unconstitutional, are not moot. The maritime defendants correctly observe that the plaintiffs have framed much of their complaint in terms of the CCC's diversions of cargo. However, the plaintiffs' complaint is not limited to this issue. The central issue in this dispute is the interpretation of the Cargo Preference Act. The defendants believe that the minimum United States-flag vessel percentage mandated by the Act must be achieved on a nationwide basis. The plaintiffs argue that this view violates both the Act and the Constitution. They contend that, under the Availability Clause, the Cargo Preference Act minimum does not apply at any port that is not served by United States-flag vessels.

The new CCC regulations have not altered the defendants' interpretation of the Cargo Preference Act. On the contrary, the first step of the new regulations requires the CCC to allocate a sufficient amount of cargo to United States-flag vessels to meet the Cargo Preference Act minimum on a nationwide basis. The result is that the CCC continues to ship less cargo through the Great Lakes ports than it would if it had adopted the plaintiffs' interpretation of the Act.

A decision on the merits of the plaintiffs' statutory and constitutional claims will still affect the rights of the parties. *See Keyishian v. Board of Regents*, 385 U.S. 589, 596, 87 S.Ct. 675, 680, 17 L.Ed.2d 629 (1967). If the courts interpret the Cargo Preference Act in the manner proposed by the plaintiffs, the plaintiffs will be entitled to declaratory and injunctive relief which will require the defendants to ship more Title II commodities through the Great Lakes ports. The plaintiffs' statutory and constitutional claims therefore are not moot.

### III.

We next consider the question of standing. The plaintiffs are contesting the actions of a federal administrative agency. The question of standing, therefore, is controlled not only by Article III of the Constitution, but by § 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1982).[5]

 In order to meet the standing requirement of Article III, a plaintiff must demonstrate that he or she "personally has suffered some actual or threatened injury," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), that the injury "fairly can be traced to the [defendant's] challenged action," *Simon v. Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 452 (1976), and that the alleged injury "is likely to be redressed by a favorable decision," *id.* at 38, 96 S.Ct. at 1924. Although these requirements provide the "irreducible minimum" necessary for standing, *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), the federal courts have added additional prudential limitations, *see, e.g., id.* at 474–75, 102 S.Ct. at 759–60 (no standing to assert "generalized grievances"). Nonetheless, the Supreme Court has consistently recognized that, within the bounds of Article III, Congress may displace these court-imposed restrictions. *See Gladstone, Realtors*, 441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9 (1979). Once Congress does so, the federal courts have no license to impose additional requirements.

---

**5.** Section 10 provides that: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1982).

In enacting § 10 of the Administrative Procedure Act, Congress exercised its power to control standing to contest federal administrative agency action. In doing so, Congress intended to displace the usual prudential limits on standing. *See Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *FAIC Securities v. United States*, 768 F.2d 352, 357 (D.C.Cir.1985). In determining whether parties have standing to contest administrative agency action, therefore, the task of the federal courts is to determine that the requirements of Article III are met, and that the intent of Congress is complied with.

The federal courts initially interpreted § 10 narrowly, holding that a plaintiff seeking to contest agency action had to have a legal interest provided by statute or common law, or that a statute had to expressly grant standing. In *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), however, the Supreme Court rejected this narrow interpretation. The *Data Processing* Court explained that the question of standing is separate from the question of whether the plaintiff has a legal interest. The question of whether the plaintiff has a legal interest, the court noted, concerns whether the party is entitled to relief. *See id.* at 153, 90 S.Ct. at 829. In contrast, standing concerns the broader question of whether a party may seek relief. The Court conceptualized standing as a question of "whether the interest sought to be protected by the complaint is arguably within the zone of interest to be protected or regulated by the statutory or constitutional guarantee in question." *Id.* Although the Court did not elaborate on the "zone of interest" concept, it indicated that § 10 was a broad grant of standing, intended to "enlarge ... the class

of people who may protest administrative action," *id.* at 154, 90 S.Ct. at 830.[6]

Although the *Data Processing* Court had sought to broaden the range of parties who had standing to contest federal agency action, decisions of this court interpreted the zone of interest concept as a restrictive test. *See, e.g., Peoples Gas, Light & Coke Company v. United States Postal Service*, 658 F.2d 1182, 1195 n. 10 (7th Cir.1981). Our analysis focused on the plaintiffs themselves, rather than the interests they were asserting. We held that plaintiffs lacked standing to challenge the actions of federal administrative agencies in carrying out their statutory duties unless the plaintiffs demonstrated that they were either protected by that statutory provision, *see, e.g., Dialysis Centers, Ltd. v. Schweiker*, 657 F.2d 135, 138 (7th Cir.1981), or that they were regulated by it, *see, e.g., Fire Equipment Manufacturers Association v. Marshall*, 679 F.2d 679 (7th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 114 L.Ed.2d 953 (1983). We added an additional requirement, holding that when plaintiffs sued to contest an agency action under one provision of a statute, they had to prove that they fell within the zone of interest of that specific provision; they could not rely on other provisions of the statute, "which may evidence different concerns, to expand the zone of interest," *Alschuler v. Department of Housing and Urban Development*, 686 F.2d 472, 480 (7th Cir.1982).

In *Clarke v. Securities Industry Association*, — U.S. —, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the Supreme Court sought to resolve some of the uncertainty surrounding the zone of interest concept. The decision in *Clarke* makes clear that the interpretation of the zone of interest test that we previously employed was too restrictive. The *Clarke* Court recognized that the question of standing to challenge

---

**6.** The Supreme Court did not clarify the zone of interest concept in subsequent standing cases. Indeed, in many cases the Court omitted any mention of it. *See* 4 Davis, *Administrative Law Treatise* § 24:17 at 275 (2d ed. 1983). Instead, the Court often focused directly on whether, in enacting a given statute, Congress had intended

to limit the broad review provision contained in the Administrative Procedure Act. *See, e.g., Japan Whaling Association v. American Cetacean Society*, — U.S.—, 106 S.Ct. 2860, 2867 n. 4, 92 L.Ed.2d 166 (1986); *Block v. Community Nutrition Institute*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984).

agency action is "basically one of interpreting congressional intent." *Id.,* 107 S.Ct. at 754. The Court also made clear that the zone of interest test is merely one tool for a court to use in order to determine this intent. *See id.* at 757. Rather than limiting our analysis to the zone of interest test, *Clarke* requires us to look at all available evidence in order to determine, in each case, whether it may "reasonably be assumed that Congress intended to permit the suit," *id.*

██ The Supreme Court's decision in *Clarke* indicates the procedure by which the lower courts are to assess congressional intent. Under *Clarke,* we must begin with the presumption that parties who meet the requirements of Article III have standing to contest actions by federal administrative agencies. *See id.* The presumption of standing, although strong, is not irrebuttable. In order to determine whether the presumption has been overcome, we first look to the zone of interest test. This test, although an important part of the standing analysis, "is not meant to be especially demanding," *id.* In order to pass this test, a party need show that it is asserting some interest that has a "plausible relationship," *id.* at 759, to at least one of the concerns that actually motivated Congress to take legislative action. To determine these concerns we must look at all relevant legislation—including other portions of the statute in question and related legislation enacted after the provision at issue. *Id.* at 755, 758. If a party fails the zone of interest test, the presumption of standing is rebutted.

██ The zone of interest test is only a part of the standing analysis. We must also look to see if there is any other evidence that Congress intended to preclude the plaintiff from suing. *Id.* at 758. This evidence may include "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984). Even if a party satisfies the zone of interest test, it may be precluded from suing if there is convincing evidence that allowing the action would thwart congressional intent.

██ The standing analysis outlined in this opinion should not be construed to suggest that, under *Clarke,* every party that meets the requirements of Article III and the zone of interest test is permitted to contest any unfavorable administrative agency action. It is critical that a court strike a "balance in a manner favoring review but excluding those would-be plaintiffs" whose suits are likely to disrupt the administrative process. *Clarke,* 107 S.Ct. at 756. Although the Administrative Procedure Act embodies Congress' belief that allowing suits by private individuals is an effective way to ensure agency compliance with law, *see* H.Rep. No. 1980, 79th Cong., 2d Sess. 41, *reprinted in Legislative History of the Administrative Procedure Act,* S.Doc. No. 79th Cong. 248, 2d Sess. 275 (1946), the Act does not grant standing to every party that claims to have been injured by a federal administrative decision. Congress has recognized that allowing parties to obtain judicial review even though they assert interests that are only marginally related to the purpose of a given statute, is "more likely to frustrate than further statutory objectives," *Clarke,* 107 S.Ct. at 756 n. 12. In each case, therefore, a court must carefully consider the limitations that we have set forth before it allows a party to contest an administrative agency action.

## IV.

The plaintiffs' claim that the government defendants' failure to find that United States-flag ships are not "available" on the Great Lakes violates the Cargo Preference Act and Title II. They also assert that the government defendants' administration of Title II violates the Port Preference Clause of the United States Constitution. We conclude that the plaintiffs have standing under Article III and the Administrative Procedure Act to bring these claims.

## A.

The plaintiffs first assert that the defendants have misinterpreted the Availability Clause of the Cargo Preference Act, and that as a result Title II cargo that would have been shipped through the Great Lakes ports has been shipped through other ports. They assert that they have standing under Article III and the Administrative Procedure Act to litigate this claim. Specifically, they claim that their interests are within the zone of interest of the Cargo Preference Act and that there is no evidence of congressional intent to bar this suit.

There is no question that the plaintiffs have standing under Article III to maintain this claim. The plaintiffs, all of whom are directly involved in transporting Title II cargo through the Great Lakes ports, have each suffered an economic injury as the direct result of the government defendants' administration of the Title II program. A decision interpreting the Cargo Preference Act in the manner advocated by the plaintiffs will preclude similar economic injury in the future. Because the plaintiffs have standing under Article III, we must therefore presume that they have standing under the Administrative Procedure Act to contest the defendants' interpretation of the Cargo Preference Act. We therefore look to the zone of interest test, and to other evidence of congressional intent, to see whether either of them rebut this presumption.

The interest that the plaintiffs assert satisfies the zone of interest test. The legislative history of the Cargo Preference Act makes clear that Congress' primary concern was to protect the American merchant marine. However, the legislative history also indicates that, in enacting the Cargo Preference Act, Congress shared the plaintiffs' concern about the effect of this legislation in situations in which no United States-flag ships are available. *See, e.g.,*

S.Rep. No. 1584, 83d Cong., 2d Sess. 2 (1954); *Waterborne Cargoes in United States Flag Vessels: Hearings on S. 3233 Before the House Comm. on Merchant Marine and Fisheries,* 83rd Cong., 2d Sess. at 14 (1954) (remarks of Rep. Ray); *id.* at 94 (statement of Acting Committee Chairman Tollefson); *id.* at 122–23 (remarks of Rep. Allen). Moreover, Congress specifically demonstrated its concern regarding the effect of the Cargo Preference Act on the Great Lakes program when it enacted the 1985 amendments. *See, e.g.,* 131 Cong.Rec. H12376 (conference comm. joint explanatory statement) (daily ed. Dec. 17, 1985); *id.* at H12523 (daily ed. Dec. 18, 1985) (remarks of Rep. Oberstar). Although this amendment was passed long after the original act, *Clarke* makes clear that we may consider subsequent legislative action that is probative of Congress' concern regarding the issue under litigation. *Clarke,* 107 S.Ct. at 755, 758. In this case, the evidence is sufficient to meet the zone of interest test.

In addition, we can find no evidence that Congress intended to bar the plaintiffs from bringing this action. Indeed, the evidence is to the contrary. At the time the 1985 amendment to the Cargo Preference Act was adopted, members of Congress were aware of the pendency of this action and made clear that the amendment was not intended to disturb it. *See, e.g.,* 131 Cong.Rec. H12522 (remarks of Rep. Stangelani) (daily ed. Dec. 18, 1985); *id.* at S18323 (daily ed. Dec. 20, 1985) (remarks of Sen. Boschwitz). We therefore have no difficulty in concluding that the plaintiffs have standing to bring this claim.[7]

## B.

The plaintiffs also allege that the government defendants' administration of Title II violates the Port Preference

---

**7.** The plaintiffs also assert that they have standing under Title II to contest the CCC's interpretation of the Availability Clause. Because we conclude that plaintiffs have standing under the Cargo Preference Act to obtain a judicial interpretation of the Availability Clause, we need not consider whether the plaintiffs also have standing to obtain the same relief under Title II. Such a determination would provide no additional benefit to the plaintiffs.

**1168**

Clause, U.S. Const. Art. I § 9 cl. 6.[8] We conclude that the plaintiffs have standing to litigate this claim.

 In *Clarke,* the plaintiffs claimed only that a federal agency had violated a statutory obligation. Here, in contrast, the plaintiffs claim that a federal agency has also violated a constitutional provision. The *Clarke* Court suggested that the requirements for standing might be more stringent in constitutional cases such as challenges to state action, to which the Administrative Procedure Act does not apply. *See Clarke,* 107 S.Ct. at 758 n. 16. However, the Court was silent as to the standards that govern challenges to allegedly unconstitutional federal agency action, to which the Administrative Procedure Act does apply. Nonetheless, we believe that the same approach set forth in *Clarke* is appropriate in both statutory and constitutional cases brought under the Administrative Procedure Act. *Cf. Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829 (articulating the zone of interest concept in terms of both statutory and constitutional provisions). We must, therefore, determine whether the presumption in favor of judicial review is rebutted by the zone of interest test or by other evidence of congressional intent.

 Under the zone of interest test, we must determine whether the interest asserted by the plaintiffs has some relationship to the purposes of the Port Preference Clause. We conclude that it does. The purpose of the Port Preference Clause is to prevent Congress from imposing regulations that would give certain states a competitive advantage over other states. *See Pennsylvania v. Wheeling & Belmont Bridge Company,* 59 U.S. (18 How.) 421, 434-35, 15 L.Ed. 435 (1856). This is precisely the interest that the plaintiffs are asserting. In the absence of any reason to believe that Congress has attempted to limit standing to bring this claim, we conclude that plaintiffs have standing to do so.

**8.** The Clause provides that "no Preference shall be given by any Regulation of Commerce or

## V.

We conclude that plaintiffs' regulatory claim is moot, that their statutory and constitutional claims are not moot, and that the plaintiffs have standing to bring the latter claims. The judgment of the district court is therefore REVERSED and the case is REMANDED.

Revenue to the Ports of one State over those of another...." *Id.*